| | | |
|---|---|---|
| **NANCIE J. CLOE,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **vs.** | ) | **Cause No. 1:10-cv-1070-WTL-MJD** |
| | ) | |
| **THE CITY OF INDIANAPOLIS,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## ENTRY ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

This cause is before the Court on the Defendant's motion for summary judgment. The motion is fully briefed, and the Court, being duly advised, rules as follows.

## I. STANDARD

Federal Rule of Civil Procedure 56(a) provides that summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." In ruling on a motion for summary judgment, the admissible evidence presented by the non-moving party must be believed and all reasonable inferences must be drawn in the non-movant's favor. *Hemsworth v. Quotesmith.com, Inc.*, 476 F.3d 487, 490 (7th Cir. 2007); *Zerante v. DeLuca*, 555 F.3d 582, 584 (7th Cir. 2009) ("We view the record in the light most favorable to the nonmoving party and draw all reasonable inferences in that party's favor."). However, "[a] party who bears the burden of proof on a particular issue may not rest on its pleadings, but must affirmatively demonstrate, by specific factual allegations, that there is a genuine issue of material fact that requires trial." *Id.* Finally, the non-moving party bears the burden of specifically identifying the relevant evidence of record, and "the court

is not required to scour the record in search of evidence to defeat a motion for summary

judgment." *Ritchie v. Glidden Co.*, 242 F.3d 713, 723 (7th Cir. 2001).

## II. FACTUAL BACKGROUND

The facts taken in the light most favorable to Cloe are as follow.[1]

Around May 1, 2007, the City of Indianapolis (the "City") hired Plaintiff Nancie J. Cloe

as an Unsafe Buildings/Nuisance Abatement Project Manager with the Department of

Metropolitan Development (the "DMD"). In this position, Cloe collaborated with DMD

divisions, city and county departments, and outside agencies to remedy neighborhood blight and

redevelop neighborhoods. Upon her hire, Cloe's immediate supervisor was the DMD's Assistant

Administrator of the Division of Community Economic Development, Jennifer Greene, but in

mid-2007, Wendy Cooper, Senior Project Manager with DMD's Community Economic

Division, assumed supervision over Cloe's position.

Cloe visited properties for two different purposes as part of her duties: multi-agency

"SWEEPs" and in response to citizen complaints. A SWEEP was conducted after a thorough

investigation into a neighborhood's compliance with various housing regulations had been

---

[1] Large sections of the City's statement of facts are undisputed, so the Court has adopted the City's statement where appropriate. However, where Cloe has disputed the City's facts, the Court has adopted those facts supported by the evidence and has construed them in the light most favorable to Cloe. At the same time, in support of her response to the City's motion for summary judgment, Cloe has provided an affidavit, parts of which conflict with Cloe's earlier deposition testimony. "A party cannot prevail on a motion for summary judgment by 'submitting an affidavit containing conclusory allegations which contradict plain admissions in prior deposition or otherwise sworn testimony.' . . . Therefore, '[w]here deposition and affidavit are in conflict, the affidavit is to be disregarded unless it is demonstrable that the statement in the deposition was mistaken.'" *Adusumilli v. City of Chicago*, 164 F.3d 353, 360 (7th Cir. 1998). Receiving no explanation from Cloe for the contradictions in her affidavit, the Court disregards her affidavit to the extent that it contradicts with her earlier deposition testimony.

completed. In preparation for a SWEEP, Cloe would schedule the appropriate city or county agencies (such as Animal Control or Code Enforcement) to visit problem properties in a neighborhood and she would then meet the agencies at the neighborhood. As the agencies investigated properties, Cloe would walk with the agencies through the neighborhood. During the SWEEP, Cloe would make sure all reported issues with the properties were addressed, and she would communicate with and assure concerned neighbors. SWEEP agencies would then submit their paperwork to her, and she would generate a SWEEP report.

Cloe also visited single properties as a result of citizen complaints. On these occasions, Cloe would walk around the exterior of vacant or abandoned structures and inspect them to make sure that the doors and windows were securely boarded. She would also talk to neighbors and address their concerns. Full inspections of the interior of these properties would only be conducted by the Health and Hospital Corporation of Marion County (the "HHC") at the request of an owner or tenant. On rare occasions, Cloe would enter a property to make sure that no one had taken up residence in the property, but this only occurred with properties that were actually owned by the City.

## A. City Department Restructuring

In early 2008, the Mayor's office entered into discussions with the DMD to develop a plan to address the City's abandoned housing problem. Pursuant to these discussions, Cloe worked with the DMD Director and the Mayor's office to recommend possible changes, which included reorganizing the DMD's Unsafe Building Program and the Nuisance Abatement Program. This recommendation required the creation of an Unsafe Buildings Manager position that would oversee three new positions: Demolition Manager, Boarding Manager, and Nuisance

Abatement Manager. According to this plan, Cloe's employment duties and responsibilities would be reassigned and divided among the Demolition Manager, Boarding Manager, and Nuisance Abatement Manager.

Some time in late 2008, DMD began implementing the divisional reorganization to strengthen the Abandoned Housing Program. The City elected to implement the Unsafe Building and Nuisance Abatement Reorganization option. Accordingly, Cloe's employment position and job duties were restructured. Cloe assumed the duties and responsibilities of the Boarding Manager position, and on January 5, 2009, Cloe's job title and duties were formally changed. Upon assumption of her Boarding Manager duties, Cloe's new supervisor became the Unsafe Buildings Manager, Michelle Winfield.

On January 23, 2009, Cloe met with Winfield to discuss the new Unsafe Buildings Department, Cloe's new job duties, and Winfield's performance expectations. Winfield subsequently memorialized this January 23, 2009, meeting in a "Memorandum of Understanding." The Memorandum of Understanding was not a formal reprimand, performance evaluation, or disciplinary action directed toward Cloe. Rather, the Memorandum of Understanding set forth Winfield's employment expectations for the new Boarding Manager position.

## B. Cloe's Disability

In December 2007, Cloe began experiencing health problems that interfered with her employment duties. Cloe notified her then-supervisor, Wendy Cooper, of her symptoms, and Cooper authorized Cloe's absence from work for evaluation and diagnosis of her health problems.

In the beginning of March 2008, Cloe's doctor diagnosed her with Multiple Sclerosis ("MS"). On March 24, 2008, Cloe's doctor directed that Cloe take time off work until May 7, 2008, due to periods of incapacity and to undergo further testing.

In late April 2008, Cloe's doctor released her to return to work but noted that she was restricted to "doing only desk work 2-3 days a week. She may need to leave early, arrive late, or call off." On April 29, 2008, Cloe tendered additional medical restrictions to the City's HR Department, both of which restricted her work to "desk work only" and limited her work week to "2-3 days a week."

On May 12, 2008, Cloe submitted a subsequent work restriction prescribed by her medical care provider to the City's HR Department that restricted her to "work 3-4 days a week with the same restriction as before until further notice."

On May 23, 2008, Cloe submitted a new work restriction to the City's HR department that stated, "Patient needs local printer by her desk. No climbing ladders. Can visit work sites, no walking @ job site can observe. Same work schedule." After the City received the appropriate approvals, found a printer, and hooked it up, Cloe was provided with a printer. However, in all, it took more than two weeks after her initial request to set Cloe up with a printer.

Cloe also suffered from a number of conditions in addition to her MS: Attention Deficit Hyperactivity Disorder, panic attacks, Fibromyalgia, and hypertension. Spelling and grammar errors, as well as failed completion of repetitive tasks, were particular problems due to the vision problems, difficulty concentrating, and memory problems stemming from Cloe's conditions. Cloe communicated these complications to her supervisors and Human Resources from April 2008 onward.

Prior to her diagnosis, Cloe was assigned approximately 70% of her work in the field, and 30% in the office. After her diagnosis, her work load was reduced almost entirely to clerical office work, which was repetitive in nature.

## C. Cloe's Parking Accommodations

When Cloe first began working for the City, she was assigned parking in a garage located at East Maryland and Alabama streets. In April 2008, Cloe notified then-supervisor Cooper and the City's HR Department that she was having trouble walking from her car to the City-County Building, but no changes were made to Cloe's parking assignment. In June 2008, Cloe decided to park in a lot closer to the building, and paid out of pocket to park in this lot. Cloe was never reimbursed for her parking expenses.

On July 2, 2008, Cloe's doctor submitted an updated medical restriction statement. This work restriction provided in relevant part:

Specified parking is preferred if possible.
Patient is allowed to walk normal basis inside office buildings using at her
    comfort level.
Patient can walk steps directly if there [is a] [hand]rail.
Patient is not allowed to enter any unsafe structures.
Patient is not allowed to climb.
Follow all [previously imposed] office and field restrictions.
Investigating Nuisance Abatement complaints [SWEEPs] follow all above
    restrictions in place.

This statement noted that Cloe "has spoken with the Director Assistant of DMD and she is in the process to determine if underground parking is available to assure that safe parking is always available." The doctor requested that, "[i]f [Cloe] is required to park in a distance the patient will

6

walk back to office at her own pace. Specified parking is preferred if possible." After receiving

this work restriction, the City assigned Cloe parking at a lot off Washington and Alabama street.[2]

On September 24, 2008, Cloe obtained from her doctor a written request for parking

accommodation. Cloe then attached this request to a completed request form required by the City

and filed it with the City on September 25, 2008. Cloe indicated in the request that she was

currently parking "on Market East of Delaware," and requested an accommodation: "continue to

let me park close to the [City-County Building] on the street or in the basement."[3]

On October 16, 2008, the City's Disability Coordinator, Juli A. Paini, granted the

request, noting that "DMD will continue to provide parking in the paved lot at the corner of

Wash[ington] and Alabama." The form granting the request also included a marginal notation: "

–> modified to spot in [City-County Building] garage."

On November 11, 2008, the City assigned Cloe a visitor's parking pass in the City-

County Building's underground garage; however, there were only four visitor parking spots in

the garage and there was "almost never" a spot available. Cloe finally received a permanent pass

for underground parking in the beginning of December 2008 when another employee left his

employment with the City.

---

[2] Cloe did not actually receive parking there until mid-October 2008.

[3] While Cloe argues that "there is no policy for how underground parking privileges are assigned," the Court notes that Cloe's supporting affidavit merely states that "I am aware of no policy with regard to how parking privileges are assigned." Meanwhile, the City asserts that parking privileges in the lot under the City-County Building are based on availability and length of employment tenure with the City, but the evidence the City cites in support does not actually support this assertion.

## D. Cloe's Work Performance

At the end of 2007, Cloe's evaluation indicated that she performed at or above expectations at all levels, including customer service orientation, teamwork and cooperation, leadership by example, personal accountability, concern for order, self-control, relationship building, and flexibility. Cloe also received a community outreach award in December 2007 from DMD Director Plambeck. Cloe received a similar award in 2008 from Indianapolis Mayor Greg Ballard.

### 1. Cloe's Participation in SWEEPs

In mid-June 2008, the DMD scheduled an interagency SWEEP at the Aspen Village Apartments for June 27, 2008. On June 26, 2008, Cooper directed Cloe not to participate in the SWEEP because Cooper believed it posed a risk to Cloe's health as noted in Cloe's medical restrictions, but Cloe appeared at the SWEEP the next day. At the time, the most recent restriction form on file for Cloe provided " No climbing ladders. Can visit work sites, no walking @ job site can observe. Same work schedule."

On June 30, 2008, Cooper issued Cloe a written disciplinary action "specific to her insubordination" for attending the SWEEP and walking the site with a health supervisor, and she was directed to "comply with all directives and requests by her supervisors" in the future. After the incident, Cloe attributed the problem to miscommunication. When Cooper later conducted Cloe's 2008 year-end performance evaluation, she did not reference the incident. In fact, Cooper noted on Cloe's evaluation that, with respect to teamwork and cooperation, Cloe performed at the "fully qualified level."

## 2. Cloe's First Disciplinary Action

On January 26, 2009, Winfield assigned Cloe a large research project. The original deadline for Cloe's research to be completed and submitted to Winfield was 5:00 p.m. on January 29, 2009. On January 27, 2009, Cloe requested intermittent FMLA-qualified leave for January 29 and 30, 2009, for medical visits. In conjunction with the City's approval of her intermittent leave request, Winfield reminded Cloe of Cloe's January 29, 2009, research project deadline and offered to assist Cloe in meeting the deadline in light of her authorized absences on January 29 and 30, 2009. Cloe assured Winfield that she would have the research completed before January 29, 2009.

On the morning of January 28, 2009, Winfield worked from home due to a snowstorm, but she contacted Cloe and inquired whether Cloe would have the research project completed and submitted to her before the end of the work day. Winfield again notified Cloe that she was available to assist Cloe with the research to ensure it was completed before her absence on January 29, 2009. Cloe specifically told Winfield that "I would get it done." Later that day, Janna Mayes, Winfield's supervisor, told Cloe that the deadline had been moved back, and Cloe assumed that Mayes also told Winfield about the deadline change. Cloe sent an email to Winfield at 8:41 p.m. on January 28 advising Winfield that she did not and would not be able to complete the research project by Winfield's deadline. Consequently, on February 2, 2009, Winfield issued Cloe a written disciplinary action for poor work performance and failure to perform an assigned duty.

### 3. Cloe's Writing Difficulties

In late 2008, Cloe's superiors were receiving complaints from various agencies and outside vendors about their inability to understand and comprehend emails and documents authored by Cloe. In response, Cooper directed Cloe to "slow down and recheck work or find someone to proof read prior to sending" in Cloe's year-end performance evaluation and set a goal date of June 2009.

On February 6, 2009, Cloe attended a meeting with her new supervisor, Michelle Winfield, and various department representatives. The purpose of this meeting was to address and discuss inaccuracies in Cloe's work product consisting of repeated spelling and grammar errors in written communications and other work product and listing incorrect addresses on HHC's demolition action requests. On February 9, 2009, Winfield memorialized the matters addressed during the February 6 meeting in a Memorandum of Understanding, which noted: "this is not a formal write-up, but a guide of how to be more efficient in your job duties." Included in the memorandum were directions for how Cloe should correct her performance issues, including "double-checking," "asking someone to review your work," "reading the e-mails out loud [sic]," and submitting documents to Winfield before sending them out.

### 4. Cloe's Second Disciplinary Action

On the evening of April 8, 2009, Cloe telephoned Winfield about a citizen complaint about an unsafe building, located at 3870 Byram Avenue in Indianapolis (the "Byram Property"), that needed an emergency demolition. Cloe requested authorization from Winfield to inspect the structure that evening. Winfield directed Cloe not to inspect the structure since neither Winfield nor Cloe had been contacted by the appropriate agency concerning the particular structure.

At approximately 4:00 p.m. on April 9, 2009, Cloe notified Winfield that Cloe had gone to the Byram Property. Cloe had taken pictures that morning and sent the pictures to HHC, but had not requested an emergency demolition herself because it was not her job to do so. Cloe further sought permission from Winfield to attend the demolition of the Byram Property. Winfield directed Cloe not attend the demolition because those responsibilities had been reassigned to HHC.

Following her discussions with Cloe and based on the danger posed to the neighbors to the Byram Property, Winfield followed-up with HHC to ensure that the demolition would be completed during the evening of April 9, 2009. During these discussions, which occurred after 5:00 p.m., Winfield learned that a demolition action request had not yet been issued for the Byram Property. Winfield worked directly with HHC to order and schedule the demolition of the Byram Property for the evening of April 9, 2009. The City, however, was forced to pay an overtime rate for the demolition because it had been ordered after 5:00 p.m.

Although Winfield had directed Cloe not to attend the demolition, DMD Director Plambeck instructed Cloe to contact the neighbors and tell them what was going on. The neighbors were disabled, and Cloe had no way of contacting them other than going to property. She visited the neighbors, sat with them, and watched the preparation for the demolition, but once the demolition started, Cloe left.

On April 10, 2009, Winfield learned that Cloe had gone to the Byram Property. Sometime thereafter Winfield issued Cloe a notice of unacceptable performance because she believed that "Nancie said that she did inspect the property . . . and that she sent an e-mail . . . to request an emergency demolition," but no demolition request had actually been sent.

Furthermore, when Winfield confronted Cloe because she believed Cloe had attended the demolition, Cloe told her that Plambeck had told Cloe to attend, which Winfield perceived as untrue because Plambeck's instruction had been for her to contact the neighbors. In the notice, Winfield explained that "Nancie has acted in an insubordinate manner, conducted poor work performance, and has been dishonest." Winfield and Cloe signed the notice of unacceptable performance on May 4, 2009.

*5. Cloe's Performance Improvement Plan*

Shortly after the Byram property incident, Winfield and Cloe met and drafted a performance improvement plan for Cloe. The performance improvement plan noted that: "Nancie has the tools necessary to perform the job; however, she continues to perform below expectations. She has consistently turned in inaccurate work, been dishonest and insubordinate." Cloe was expected to improve in several areas, including following directions from her supervisors, improving her attitude toward her coworkers ("poor attitude, insubordination and hostile behavior will not be tolerated"), improving her communication about her projects and about her need for assistance, and improving her accuracy on documentation.

*6. Termination of Cloe's Employment*

As a result of Cloe's failure to meet and satisfy minimum performance standards, which were specifically set forth in the January 23, 2009,  and February 9, 2009, Memoranda of Understanding and again in the May 4, 2009, Performance Improvement Plan, Cloe was issued

written disciplinary action on June 11, 2009, recommending the termination of her employment. On June 29, 2009, the City accepted the recommendation and terminated Cloe's employment.[4]

On June 12, 2009, Cloe filed a "Charge of Discrimination" with the Equal Employment Opportunity Commission for disability discrimination and retaliation. On August 6, 2010, Cloe received a notice of right to institute a civil action.

On August 25, 2010, Cloe filed suit against the City, alleging that it had violated Title I of the Americans with Disabilities Act by discriminating against her because of her disability, refusing to accommodate her disability, and retaliating against her.

## III. DISCUSSION

The Americans with Disabilities Act (the "ADA") prohibits an employer from discriminating against an employee or prospective employee on the basis of disability with respect to application procedures, hiring, advancement, discharge, compensation, training and other terms, conditions, and privileges of employment. 42 U.S.C. § 12112(a). Discrimination under the ADA includes "not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability . . . unless [the employer] can demonstrate that the accommodation would impose an undue hardship on the operation of [its] business." 42 U.S.C. § 12112(b)(5)(A). Further, the ADA prohibits employers from retaliating against employees who oppose acts of discrimination under the ADA. 42 U.S.C. §

---

[4] The City has provided an exhibit purporting to clarify the events serving as the basis for this final disciplinary action, which exhibit Cloe moves to strike because (1) the document has not been authenticated, and (2) the document is inadmissible hearsay. To the extent that the document is being used to prove the truth of the matter asserted, this objection is well taken, as the City has not pointed to sufficient evidence from which the Court could conclude that the document falls within any hearsay exception.

12203(a). Cloe has alleged violations of each of these provisions, which will be address in turned below.

## A. Disability Discrimination Claim

A disabled plaintiff proves disability discrimination under either the direct or indirect method. Under the indirect method employed by Cloe here, the plaintiff establishes a *prima facie* case of discrimination by showing that (1) she is disabled under the ADA; (3) she was meeting her employer's legitimate employment expectations; (3) she suffered an adverse employment action; and (4) similarly situated employees without a disability were treated more favorably. *E.g.*, *Dickerson v. Bd. of Trs. of Cmty. Coll. Dist. No. 522*, 657 F.3d 595, 601 (7th Cir. 2011). Once the plaintiff has established her prima facie case, the burden shifts to the employer to present a legitimate and non-discriminatory reason for the employment action. *Id.* Upon such a showing, the burden then shifts back to the plaintiff to prove by a preponderance of the evidence that the employer's proffered reason is a pretext for discrimination. *Id.*

Cloe argues that she was discriminated against on the basis of her disability in that she was discharged, which discharge was predicated on fabricated poor performance warnings: "the City used the symptoms and circumstances of [Cloe's] disability to fabricate performance related issues in [her] personnel file" and thereupon built a case for her termination. Indeed, discharge is an adverse employment action, *Rehling v. City of Chicago*, 207 F.3d 1009, 1018 n.6 (7th Cir. 2000) (citing 42 U.S.C. § 12112(a)), and if Cloe's discharge were based not on any legitimate performance issues, but rather on her disability, that discharge would violate the ADA. The inference that her discharge was based on her disability, however, arises only after the plaintiff

satisfies the other elements of her prima facie case; specifically, Cloe must show that (1) she was meeting the City's legitimate employment expectations, and (2) similarly situated employees without a disability were treated more favorably.[5]

While the City argues that Cloe failed to meet several performance standards and cites notices issued to her for unacceptable performance, Cloe argues that she was meeting the City's legitimate employment expectations because (1) the City's issues with her performance were fabricated, and (2) the allegations made against Cloe that led to her termination were the result of her disability. The Court will address each of these issues in turn.

First, while Cloe points to her 2007 and 2008 performance reviews indicating that she was meeting or exceeding expectations, Cloe has not identified any evidence from which a reasonable jury could conclude that the City's notices of poor performance were fabricated. In casting doubt on the truth behind the City's basis for her discharge, Cloe collapses the second-stage pretext inquiry with the second prong of her prima facie case. *See Hague v. Thompson Distrib. Co.*, 436 F.3d 816, 823 (7th Cir. 2006) ("[I]f the plaintiffs argue that they have performed satisfactorily and the employer is lying about the business expectations required for the position, the second prong and pretext question seemingly merge because the issue is the same–whether the employer is lying."). Yet the plaintiff must still meet her burden, and the Court must "keep[ ] in mind that if the plaintiffs did not present sufficient evidence of pretext, they also did not show that they were meeting their employer's expectations." *Id.* The question in the pretext inquiry

---

[5] The City agrees that Cloe was disabled as defined by the ADA during the relevant time period.

is not whether the employer's stated reason was inaccurate or unfair, but whether the employer honestly believed the reasons it has offered to explain the discharge. . . . It is not the court's concern that an employer may be wrong about its employee's performance, or may be too hard on its employee. Rather, the only question is whether the employer's proffered reason was pretextual, meaning that it was a lie.

*Coleman v. Donahoe*, — F.3d —, 2012 WL 32062 at *12 (7th Cir. 2012) (citing *Naik v. Boehringer Ingelheim Pharms., Inc.*, 627 F.3d 596, 601 (7th Cir. 2010)) (citations omitted).

Cloe has not demonstrated that the City's asserted basis is a pretext for discrimination. To be sure, she has cast doubt on the accuracy of the City's perception of the events surrounding her alleged poor performance, but she has not identified any evidence showing that the supervisors who issued her unacceptable performance notices were lying, as opposed to merely mistaken. For example, Cloe argues merely that while she did attend the SWEEP on June 27, 2008, she did not walk around the site, all in accord with her doctor's authorization. Likewise, Cloe explains that she did not complete the January 26, 2009, project by January 29, 2009, because Winfield's supervisor, Mayes, had pushed back the deadline, but Cloe further testified that she never told Winfield about Mayes' extension of the deadline, subverting an argument that Winfield's later discipline for missing the deadline was pretextual. As Cloe has not shown that the City was lying, she cannot show that she was meeting her employer's legitimate employment expectations.

Second, Cloe argues that the City gradually reduced her field work and forced her into desk work so that it could exploit the symptoms of her disability – spelling and grammar errors – as the basis for her termination. Cloe argues that "the allegations made against Cloe which led to her termination are curious for another reason: many of them are the result of her disability," but it is not entirely clear to what specific "allegations" Cloe is referring. Two paragraphs preceding

this argument, Cloe refers to "the disciplinary action taken against Cloe which led to her termination" and discusses the following: the June 2008 SWEEP incident, the January 2009 project deadline incident, the Byram property incident, and Winfield's proofreading requirement. However, as the City points out, none of the disciplinary actions Cloe received were issued for entering data inaccurately, misspelling words, or making grammatical errors. Rather, the notices of unacceptable performance that she received refer to insubordination, poor performance, and dishonesty, none of which Cloe has demonstrated were fabricated, as set forth above. Furthermore, Winfield's proofreading requirement was not discipline; rather, it was the City's attempt at accommodating the symptoms of Cloe's disability and as such it is discussed more appropriately in that context.

Having failed to put forth evidence from which a reasonable jury could conclude that she was meeting the City's legitimate employment expectations, Cloe has not established a prima facie case of discrimination based on disability.[6] Therefore, the City is entitled to summary judgment on Cloe's ADA discrimination claim and the City's motion as to that claim is hereby **GRANTED**.

### B. Disability Accommodation Claim

The ADA requires employers to provide "reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability . . . unless [the employer] can demonstrate that the accommodation would impose an undue hardship." 42 U.S.C. § 12112(b)(5)(A). However, a plaintiff must normally request an accommodation before

---

[6] Because Cloe fails on the second prong of the prima facie case, the Court need not address whether she has established that similarly situated employees not having a disability were treated more favorably.

liability under the ADA attaches. *Jovanovic v. In-Sink-Erator Div. of Emerson Elec. Co.*, 201 F.3d 894, 899 (7th Cir. 2000). "To determine the appropriate reasonable accommodation it may be necessary for the [employer] to initiate a formal, interactive process with the [employee]." 29 C.F.R. 1630.2(o)(3).

An employee alleging an employer's failure to accommodate under the ADA must show that (1) she is a qualified individual; (2) the employer was aware of her disability; and (3) the employer failed to reasonably accommodate her disability. *Kotwica v. Rose Packing Co., Inc.*, 637 F.3d 744, 747-48 (7th Cir. 2011). A reasonable accommodation means "[m]odifications or adjustments to the work environment, or to the manner or circumstances under which the position held or desired is customarily performed, that enable a qualified individual with a disability to perform the essential functions of that position." 29 C.F.R. § 1630.2(o)(1)(ii).

Cloe argues that (1) the City did not provide her with a printer within a reasonable amount of time; (2) the City did not accommodate her request for a closer parking space within a reasonable amount of time; (3) the City's attempt to accommodate her writing deficiencies was not adequate because the supervisor charged with reviewing Cloe's work was "rarely around"; and (4) the City's restriction on her activities in the field was the result of confusion about her job duties. The City, in turns, argues that it reasonably responded to her requests for accommodation and satisfied its obligations under the ADA.

First, Cloe argues that the City did not reasonably accommodate her because it did not provide her with a personal printer and a close parking space in a reasonable amount of time. The reasonableness of an accommodation may hinge on the timeliness of the accommodation. *See Jay v. Intermet Wagner Inc.*, 233 F.3d 1014, 1017 (7th Cir. 2000). At the same time,

"reasonableness does not depend solely on effectiveness or timeliness; in some circumstances, an accommodation can be reasonable even if it does not work as well as expected or if it takes a while to take effect.

But reasonableness does depend on a good-faith effort to assess the employee's needs and to respond to them." *Feliberty v. Kemper Corp.*, 98 F.3d 274, 280 (7th Cir. 1996). "A party that obstructs or delays the interactive process is not acting in good faith. A party that fails to communicate, by way of initiation or response, may also be acting in bad faith." *Beck* v. *Univ. of Wisconsin Bd. of Regents*, 75 F.3d 1130, 1135 (7th Cir. 1996); *see Selenke v. Medical Imaging of Colo.*, 248 F.3d 1249, 1262-63 (10th Cir. 2001) (explaining that, in assessing timeliness claims, "courts have considered . . . the length of the delay, the reasons for the delay, whether the employer has offered any alternative accommodations while evaluating a particular request, and whether the employer has acted in good faith," and finding that, with respect to one requested accommodation, the employee's claim failed because she had failed to produce any evidence indicating that the employer had been acting in bad faith).

With regard to the printer, Cloe has simply failed to point to any evidence relating to the roughly two-week delay in its arrival from which a jury could reasonably conclude that the City failed to accommodate Cloe's needs in a reasonable manner. The City therefore is entitled to summary judgment with regard to this issue.

With regard to the parking accommodation, Cloe argues that she first notified the City of her need for special parking accommodations in April 2008, but she was not accommodated until, at the earliest, October 2008, and more realistically, December 2008. It is unclear from the record what accommodations Cloe requested that she did not receive, but it appears that Cloe

attempts to cast all of her requests as unequivocal requests for parking in the garage under the City-County building. The record does not bear this out. For example, Cloe does not explain the specifics of her April 2008 accommodation requests, and her September 2008 request merely asks the City to "*continue* to let [Cloe] park close to the [City-County Building] on the street or in the basement" (emphasis added). Regardless, the eight-month time span between request and accommodation is the only evidence to which Cloe points in support of her claim, and this is not enough. While Cloe broadly alleges that "the City dragged their feet in accommodating her requests," Cloe has produced no evidence from which a reasonable jury could come to this conclusion, as Cloe has produced no evidence that this eight-month time span was the result of obstruction, unjustified delay, or failure to communicate on the part of the City.[7] *Cf. Krocka v. Riegler*, 958 F. Supp. 1333, 1343 (N.D. Ill. 1997) (finding that the court could not say whether an eight-month delay was a reasonable delay as a matter of law when the employer initially refused outright to consider any accommodation for the employee's particular disability). Thus, Cloe has provided no evidence from which a reasonable jury could conclude that actions taken by the City regarding Cloe's parking needs failed to satisfy the ADA. The City is entitled to summary judgment on this issue as well.

Cloe also argues that the City's attempt to address her writing deficiencies was unreasonable because her supervisor was rarely around to proofread Cloe's work. In so doing,

---

[7] Cloe does argue that "Despite their [sic] being no policy with regard to underground passes, Cloe did not receive a permanent pass until early December, 2008. The City could have easily have [sic] relocated someone out of the underground facility." As explained above, this argument is not supported by the evidence of record; Cloe's affidavit merely states that she was "not aware" of any City parking policy. Thus, Cloe is in no position to assert the relative ease or difficulty – and thus reasonableness – of relocating another employee's parking space to accommodate her.

Cloe implicitly invokes the definition of reasonable accommodation: such an accommodation "enable[s] a qualified individual with a disability to perform the essential functions of that position." As such, Cloe takes issue with the solution offered by the City as not being an "accommodation" at all, much less a "reasonable" one. Cloe argues that Winfield's unavailability "resulted in errors made by Cloe," but fails to point to any evidence of these errors or their consequences. Cloe then goes on to argue that "requiring Cloe to submit her work product for review to Winfield did not allow Cloe to perform the essential functions of her position because Winfield was rarely around," but yet again Cloe cites no evidence to support this assertion. "Argument is not evidence upon which to base a denial of summary judgment." *Scherer v. Rockwell Intern. Corp.*, 975 F.2d 356, 361 (7th Cir. 1992). Because Cloe has not shown how her supervisor's absence is relevant to whether the City accommodated Cloe's claim, the City is entitled to summary judgment as to Cloe's claim for accommodation of her writing deficiencies.

Finally, Cloe's argument that the City's restrictions on her work "overrode Cloe's doctor's restrictions" is essentially an argument that the City over-accommodated her, but that argument is a strange fit for a claim of failure to accommodate, as it is really a claim that her employers did too much, as opposed to not enough. While over-accommodation may in some circumstances be more properly cast as discrimination in terms and conditions of employment, Cloe has not made that argument here. Furthermore, even if Cloe's over-accommodation claim is cognizable as a failure to accommodate claim, Cloe has produced no evidence that this accommodation was unreasonable; rather, Cloe asserts merely that the City is "confused" about Cloe's work duties. Because Cloe has produced no evidence in support of her claim for failure to

accommodate with respect to her SWEEP restrictions, and she has not cast this claim as a discrimination in terms and conditions of employment claim, the City is entitled to summary judgment as to this claim.

For the reasons set forth above, the City's motion for summary judgment on Cloe's failure to accommodate claims is **GRANTED**.

### C. Retaliation Claim

The anti-retaliation provision of the ADA provides that "[n]o person shall discriminate against any individual because such individual has opposed any act or practice made unlawful by this chapter or because such individual made a charge, testified, assisted, or participated in an investigation, proceeding, or hearing under this chapter." 42 U.S.C. § 12203(a). Under the direct method employed by Cloe here, a plaintiff alleging retaliation under the ADA must show that (1) she engaged in statutorily protected activity; (2) she sustained an adverse employment action; and (3) a causal link between the protected activity and the employer's actions existed. *E.g.*, *Dickerson*, 657 F.3d at 601-02.

"It is axiomatic that a plaintiff engage in statutorily protected activity before an employer can retaliate against her for engaging in statutorily protected activity," *Durkin v. City of Chicago*, 341 F.3d 606, 614-15 (7th Cir. 2003). To this end, Cloe asserts that she engaged in protected activity when she requested accommodations. A request for an accommodation is a statutorily protected activity. *See Yindee v. CCH, Inc.*, 458 F.3d 599, 602 (7th Cir. 2006).[8] While Cloe

---

[8] The Court notes, as does the Eighth Circuit, that this theory is difficult to square with the text of the statute, because "[a]n employee who asserts a right under 42 U.S.C. 12112(b)(5)(A) to obtain reasonable accommodation for an alleged disability has not 'opposed any act or practice made unlawful' by the ADA." *Kirkeberg v. Canadian Pacific Ry.*, 619 F.3d 898, 907 (8th Cir. 2010) (holding ultimately that a request for accommodation is a protected

never clearly identifies the specific adverse employment actions she received after she requested accommodations, the Court can glean three potentially adverse actions from Cloe's filings:[9] (1) the "write-ups" Cloe received after Winfield became Cloe's supervisor; (2) the written notice of poor performance received after the Byram incident; and (3) Cloe's termination.

Cloe then presents her argument regarding causation, the majority of which follows:[10]

> In this particular case, Cloe can demonstrate suspicious timing. Before Winfield became her supervisor, Cloe was performing very well. After Winfield became her supervisor, Cloe started accumulating write-ups. Some of the write-ups were fabricated, and others were related to her disability itself. After the Byram Incident, Cloe was not initially disciplined. She was not disciplined until after a meeting with Winfield and Mays in which Cloe indicated that she had to leave because she had a doctor's appointment and Winfield and Mays became upset that she needed to see a doctor. On May 7, 2009, Cloe applied for FMLA recertification. She was terminated about a month later.
> In addition, [Department Administrator Jennifer] Fultz and Winfield both indicated to Cloe that her medical condition was not effecting [sic] her work. Hence, they did not believe that she needed any accommodations.

With respect to Cloe's argument that retaliation is evidenced by the "write-ups" she received after Winfield became her supervisor, it is unclear whether these "write-ups" constitute adverse

---

activity because the right to request an accommodation is roughly analogous to the right to file a complaint with the EEOC and discarding the alternative as "anomalous"). Nonetheless, this Court will follow the majority of courts, including the Seventh Circuit, who have assumed that requesting an accommodation is statutorily protected activity. *See, e.g.*, *Yindee v. CCH, Inc.*, 458 F.3d 599, 602 (7th Cir. 2006) ("Let us suppose, however, that a prima facie case of retaliation has been made out, on the theory that CCH may have been retaliating for Yindee's request to telecommute as an accommodation"); *Cassimy v. Bd. of Educ. of Rockford Public Schs., Dist. No. 205*, 461 F.3d 932, 938 (7th Cir. 2006) ("In Cassimy's case, everyone agrees that he engaged in statutorily protected expression when he requested an accommodation.").

[9] The Court requested additional briefing on the "statutorily protected activity" element and the parties submitted supplemental briefs addressing the issue.

[10] Cloe's initial brief and the portion from Cloe's supplemental brief not cited above contend that the City's reasons for Cloe's termination are pretextual, an argument that the Court has already addressed, and rejected, above.

employment actions.[11] An adverse action is "one that a reasonable employee would find to be materially adverse such that the employee would be dissuaded from engaging in the protected activity." *Silverman*, 637 F.3d at 740. Cloe has provided no evidence that she was dissuaded from requesting accommodations in the future. However, assuming for the now that these "write-ups" do constitute adverse employment actions, Cloe's argument still fails. With the one exception addressed below, Cloe has not identified to the Court the relevant "write-ups" or the relevant requests for accommodation;[12] in so doing, she has failed to draw even the weakest connection: she has not even shown temporal proximity. In short, Cloe has produced absolutely no evidence from which a reasonable jury could conclude that there exists a causal link between these "write-ups" and her requests for accommodation.

Cloe contends that the "write-up" she received after the Byram incident was issued in retaliation. Cloe argues that she was disciplined for the April 9, 2009, Byram incident on May 4, 2009, after a meeting with Winfield and Mayes in which Cloe indicated that she needed to leave for a doctor's appointment, which upset Winfield and Mayes. However, Cloe has not put forth any evidence regarding the nature of the doctor's appointment and its relationship to her disability. Therefore, Cloe has not put forth sufficient evidence from which a reasonable jury

---

[11] Cloe received "Notices of Unacceptable Performance," "Memoranda of Understanding," and "Performance Improvement Plans" throughout her employment. It is unclear about which Cloe complains.

[12] While the Court could create its own timeline of relevant "write-ups" and requests for accommodation, the Court "is not required to scour the record in search of evidence to defeat a motion for summary judgment," *Ritchie v. Glidden Co.*, 242 F.3d 713, 723 (7th Cir. 2001), nor is the Court required to construct arguments on behalf of litigants.

could conclude that this request to leave constituted a request for accommodation, and her claim for retaliation for the Byram incident "write-up" fails.

Finally, Cloe argues that her employment was terminated in response to her repeated requests for accommodations. Discharge is an adverse employment action. *Rehling*, 207 F.3d at 1018 n.6 (citing 42 U.S.C. § 12112(a)). Thus the remaining issue before the Court is whether there exists a causal link between Cloe's many requests for accommodation and her termination.

"The mere fact that one event preceded another does nothing to prove that the first event caused the second; the plaintiff also must put forth other evidence that reasonably suggests that her protected speech activities were related to her employer's discrimination." *Lewis v. City of Chicago*, 496 F.3d 645, 656 (7th Cir. 2007) (citing *Burks v. Wis. Dep't of Transp.*, 464 F.3d 744, 758-59 (7th Cir. 2006)); *cf., e.g.*, *Casna v. City of Loves Park*, 574 F.3d 420, 427 (7th Cir. 2006) (noting the extreme case where suspicious timing alone creates a factual issue when employee was terminated one day after protected conduct). Cloe asserts that the existence of the link between her activity and her termination can be inferred from suspicious timing, ambiguous oral or written statements and other behavior of her supervisors and the fact that the City gave pretextual reasons for her termination. Specifically, Cloe argues that suspicious timing exists in the sudden change in her performance reviews when Winfield became her supervisor. Cloe contends that these poor performance reviews were fabricated. Suspicious timing also exists, according to Cloe, because Cloe was discharged one month after she reapplied for FMLA recertification. Cloe also alleges that she was not disciplined for the Byram incident until she later requested leave for a doctor's appointment. Finally, Cloe asserts that two supervisors told

her that her medical condition was not affecting her work, which Cloe argues indicate that they did not believe Cloe needed any accommodations.[13]

The majority of Cloe's evidence goes to establish temporal proximity, but this is not enough. *Oest v. Ill. Dep't of Corrs.*, 240 F.3d 605, 616 n.8 (7th Cir. 2001) (collecting cases establishing that intervals of one year, eight months, nearly six months, five months, four months, and three months are too attenuated to raise inference of discrimination). Cloe must put forth "other evidence that reasonably suggests that her protected speech activities were related to her employer's discrimination." *Lewis*, 496 F.3d at 656. The "other evidence" Cloe has put forth is Fultz's and Winfield's comments; Cloe also argues that the City's reasons for her termination are pretext. This evidence is insufficient to establish the element of causation for Cloe's prima facie case of retaliation. Perhaps Fultz's and Winfield's comments that Cloe's disability was not affecting her work may be read to indicate that they believed that she did not need accommodations, but they cannot support the inference that Fultz and Winfield recommended Cloe's termination because she requested accommodations. In addition, the Court has already held that Cloe has failed to show pretext because Cloe has produced no evidence to show that her supervisors were lying. For these reasons, Cloe has not established causation and therefore fails to set forth sufficient evidence to establish her prima facie case of retaliation.

For the reasons explained above, the City's motion for summary judgment as to Cloe's ADA retaliation claim is **GRANTED.**

---

[13] The City makes much of the fact that Cloe did not follow any of the City's established complaint procedures. However, "statutorily protected activity can range from filing formal charges to voicing informal complaints to superiors." *Casna*, 574 F.3d at 427 (citations omitted).

## IV. CONCLUSION

For the reasons set forth above, the City's motion for summary judgment as to Cloe's

claims is hereby **GRANTED** in its entirety.

SO ORDERED:  3/6/12

_William T Lawrence_

Hon. William T. Lawrence, Judge
United States District Court
Southern District of Indiana

Copies to all counsel of record via electronic communication.